E-FILED
Wednesday, 27 May, 2020  12:58:50 PM
Clerk, U.S. District Court, ILCD

GZ                                                                    Firm I.D. #42907

**IN THE UNITED STATES DISTRICT COUNTY**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| NES MICHIGAN, INC.<br>a Michigan corporation, | ) <br> ) <br> ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: |
| | ) | |
| GALESBURG COTTAGE HOSPITAL<br>an Illinois corporation, | ) <br> ) <br> ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR BREACH OF CONTRACT**

 **NOW COMES** the Plaintiff, NES Michigan, Inc. (hereinafter "NES"), by and through its attorneys, SmithAmundsen, LLC, and for its Complaint against the Defendant, Galesburg Hospital Corporation d/b/a Galesburg Cottage Hospital (hereinafter "Galesburg Cottage Hospital"), states as follows:

**PARTIES, JURISDICTION, AND VENUE**

 1. At all relevant times, Plaintiff NES is a corporation organized under the laws of the State of Michigan, having its principal place of business in Tiburon, California. NES is in the business of providing Emergency Department and Hospitalist Medicine management and staffing services to hospitals nation-wide.

 2. At all relevant times, Defendant Galesburg Cottage Hospital is a corporation organized under the laws of the State of Illinois, having its principal place of business in Galesburg, Illinois. Galesburg Cottage Hospital is a healthcare facility that provides inpatient, outpatient and emergency care.

3.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a), based on the diversity of citizenship between the parties and the amount in controversy being in excess of $75,000.00, exclusive of interests and costs.

4.      This action properly lies in the Central District of Illinois, because a substantial part of the events giving rise to the claims occurred in this judicial district. 28 U.S.C. § 1391(b)(2).

5.      This Court has authority to declare and enter judgment on the rights and liabilities of the parties, and order appropriate relief thereon.

## FACTS

6.      On or about November 30, 2017, NES and Galesburg Cottage Hospital entered into a Contract for Emergency Department Staffing Services (the "Contract"), for NES to locate and place physicians to provide medical coverage in the emergency department of Galesburg Cottage Hospital. A true and accurate copy of the Contract is attached hereto as "Exhibit A."

7.      The term of this Contract began on December 1, 2017 and would end on December 1, 2020. Exh. A at 10.

8.      Since the commencement of the Contract, NES has recruited, facilitated credentialing, and scheduled at least twelve (12) physicians to provide services in the emergency department of Galesburg Cottage Hospital. All those physicians providing services under the Contract are independent contractors under contract with NES. Exh. A at 2.

9.      Article 2.4 of the Contract contains a provision reads as follows:

> It is expressly agreed between Hospital and NES that due to the nature of the business of NES, the expertise exercised by NES in securing services of physicians, and the irreparable harm to NES resulting from loss of said physicians due to the limited number of physicians that provide said services and due to the cost and expense incurred by NES in obtaining said services of physicians, that during the term of this contract and for a period of one year thereafter, Hospital or

any organization of facility directly or indirectly affiliated with Hospital will not directly or indirectly enter into any agreement covering the same or similar services as are provided herein with any physician introduced to it by NES or with whom it came into a business or professional relationship as a result of this contract except that NES shall not prevent any physician who hold active staff membership from treating his patients in the hospital emergency room department. Hospital acknowledges that NES, upon termination of this contract, could place physician who provided services under this contract at other hospitals and thus continue to benefit from the investment NES has made in securing the services of said physicians. Therefore, in addition to any and all remedies available to NES and under this and any other Agreements, Hospital agrees that if it, or any hospital or parent or subsidiary corporation of the Hospital, employs, schedules or permits the scheduling of any physician in violation of the terms of its agreements herein, Hospital will pay NES twenty-five thousand Dollars ($25,000) per physician and ten thousand ($10,000) per APP.

Exh. A at 3 (emphasis added).

10.    According to Article 10.2.2 of the Contract, either party may terminate the Agreement without cause, upon giving the non-terminating party 90 days prior written notice of the terminating party's intent to terminate. The notice shall state the date of termination of the Agreement. Exh. A at 10.

11.    On or about January 24, 2020, Galesburg Cottage Hospital sent a letter to NES to terminate the Contract without cause, effective May 1, 2020 (the "Termination Date"). A true and accurate copy of the termination letter is attached hereto as "Exhibit B."

12.    Upon information and belief, Galesburg Cottage Hospital has retained and will continue to keep at least twelve (12) of the physicians NES introduced to Galesburg Cottage Hospital after the Termination Date, in violation of the Contract.

13.    Pursuant to Article 2.4 of the Contract, Galesburg Cottage Hospital is obligated to pay NES $25,000 for each of the aforementioned physicians NES located and placed in Galesburg Cottage Hospital.

14.     On or about March 20, 2020, NES issued an invoice to Galesburg Cottage Hospital in the amount of $300,000 (12 x $25,000) as provider buyout fees for the twelve physicians known to NES who are retained by Galesburg Cottage Hospital to provide services after the Contract is terminated.

15.     As of the date this Complaint is filed, Galesburg Cottage Hospital has not provided a complete list of the physicians placed by NES who will continue to stay at Galesburg Cottage Hospital after the Termination Date. The total buyout fees Galesburg Cottage Hospital owed to NES may exceed $300,000.

## COUNT I
## Breach of Contract

16.     NES repeats and realleges Paragraphs 1 through 15 as and for its Paragraph 16 of this Count I as though fully set forth herein.

17.     The Contract is a valid agreement between NES and Galesburg Cottage Hospital.

18.     According to the Contract, Galesburg Cottage Hospital should not enter into any agreement with the physicians introduced to it by NES for the physicians to provide the same or similar services for a period of one (1) year following the term of the Contract.

19.     After Galesburg Cottage Hospital terminated the Contract on May 1, 2020, it is still in agreement with at least twelve (12) of the physicians NES located and placed in its emergency department by NES for these physicians to provide the same services under the Contract.

20.     Galesburg Cottage Hospital's retention of the aforementioned physicians violates the terms of the Contract.

21.     Galesburg Cottage Hospital agrees that if it or its parent or subsidiary corporation employs or schedules any physician in violation of the Contract, it will pay NES twenty-five thousand Dollars ($25,000) per physician as buyout fees.

22.     Galesburg Cottage Hospital owes at least $300,000 buyout fees to NES under the Contract.

23.     As of the date this Complaint is filed, Galesburg Cottage Hospital has failed to pay any buyout fees to NES.

24.     Galesburg Cottage Hospital's failure to pay the buyout fees is a material breach of the Contract. NES has been damaged by Galesburg Cottage Hospital's such breach.

WHEREFORE, Plaintiff, NES Michigan, Inc., respectfully requests this Honorable Court enter a judgment against Defendant, Galesburg Hospital Corporation d/b/a Galesburg Cottage Hospital, for breach of contract, damages of at least $300,000, pre-judgment interest, reasonable attorneys' fees, costs, expenses, and all other and further relief as is appropriate.

**COUNT II**
**Reformation of Contract**

25.     NES repeats and realleges Paragraphs 1 through 24 as and for its Paragraph 25 of this Count II as though fully set forth herein.

26.     NES serves hospitals nation-wide. The Contract was modified from an old template that was used by NES for a different customer.

27.     The Contract was prepared under time constraints.

28.     The last paragraph of the Contract – Section 12.12 Dispute Resolution – was mistakenly left in this Contract during the course of contract negotiation due to the time pressure .

29.     Section 12.12 of the Contract states the following:

> Other than relief seeking remedies of an equitable nature, for which resort to any court of competent jurisdiction may be had by either party, any controversy arising under, out of, in connection with, or relating to this Agreement, any amendment thereto, or the breach thereof, shall be determined and settled by arbitration in <u>New Iberia, LA</u> […]."

Exh. A at 12-13 (emphasis added).

30.    Section 12.12 was included in the Contract due to a mistake as it would be prejudicial and unpractical for both parties – NES, a Michigan corporation, and Galesburg Cottage Hospital, an Illinois entity – to conduct arbitration in a city in Louisiana, which is located in a foreign jurisdiction more than 1,000 miles away from both of them. Any reasonable parties would not make such a decision to solve their potential contract disputes.

31.    Prior to the drafting of this Contract, Galesburg Cottage Hospital proposed to use its own service agreement template and the parties negotiated the terms therein for this transaction. The negotiated template did not contain any arbitration provision. The parties eventually chose to use NES' existing contracts to form the Contract at issue.

32.    Although the parties did not intend to include Section 12.12 in the Contract, when reducing the agreement between the parties to writing, Section 12.12 was not removed due to mutual mistake of the parties.

33.    Alternatively, Galesburg Cottage Hospital knowingly remained silent as to the unilateral mistake made by NES in leaving Section 12.12 in the Contract so as to take advantage of it.

34.    NES was unaware of the aforementioned drafting error when it entered the Contract. NES did not realize the Contract contained such a Dispute Resolution provision until it was preparing for the filing of this lawsuit.

WHEREFORE, Plaintiff, NES Michigan, Inc., requests a judgment for reformation of the Contract to conform to the parties' intention and meeting of the minds to severe and delete Section 12.12 of the Contract and all other and further relief as is appropriate.

Respectfully Submitted,


/s/ Gary Zhao_____


SmithAmundsen LLC
150 N. Michigan Avenue
Suite 3300
Chicago, IL 60601
312-894-3200
gzhao@salawus.com

# EXHIBIT A

## CONTRACT FOR EMERGENCY DEPARTMENT STAFFING SERVICES

This **CONTRACT FOR EMERGENCY DEPARTMENT STAFFING SERVICES**
("Agreement") is made and entered into on the _____ day of October, by and between Galesburg
Cottage Hospital, located in Galesburg, IL (hereinafter referred to as "Hospital") and NES
Michigan, Inc (hereinafter referred to as "Corporation").

### PREAMBLE

**WHEREAS,** Hospital owns and operates a hospital, which is licensed and operates an
emergency department (the "Department");

**WHEREAS,** Hospital is desirous of obtaining the services of Corporation to locate and
place Physicians to provide medical coverage in the Department; and

**WHEREAS,** Corporation is willing to provide such services pursuant to the terms and
conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual covenants, promises, and agreements
herein contained and for other good and valuable consideration, the sufficiency and receipt of which
are hereby acknowledged, the parties agree as follows:

### Article 1.
### ENGAGEMENT

1.1     Corporation's Undertaking.  Hospital hereby contracts with Corporation to locate
and arrange for physicians to provide physician services at the Hospital in its Emergency
Department (the "Physician Services").  Corporation agrees to locate and arrange for physicians
("Physicians") to provide such Physician Services in accordance with the terms and conditions set
forth herein.

1.2     Exclusivity.  Throughout the term of this Agreement, Hospital shall not enter into a
similar agreement with any other person or entity for those services provided by Corporation.

### Article 2.
### SERVICES PROVIDED BY CORPORATION

2.1     Written Agreement Required.  Corporation agrees to locate Physicians who are
willing to provide Physician Services at the Department. All Physicians providing services under
this Agreement are independent contractors under contract with Corporation.

2.2     General Obligations of Each Physician. Each Physician provided shall meet the
following Hospital performance obligations at all times during which Physician provides Physician
Services:

2.2.1  Quality Assurance and Risk Management. Each Physician shall accept the duties as determined by the medical staff of the Hospital and shall abide by the bylaws and the rules and regulations as set forth by the medical staff of the Hospital.

2.2.2  Compliance with Accreditation Standards. Each Physician shall cooperate with Hospital in its efforts to comply with all applicable standards promulgated by the Medicare, licensing bodies, and any other accrediting bodies, and any surveys conducted thereby. Each Physician shall comply with all reasonable directives of Hospital required for Hospital's or Physician's compliance with accrediting or licensing bodies' standards or directives.

2.2.3  Licensure and Medical Staff Membership. Each Physician provided by Corporation shall:

> (a)  Hold a current unrestricted license to practice medicine in the state of Illinois;
>
> (b)  Meet the requirements for medical staff membership at the Hospital at which he/she provides Physician Services, and shall comply with applicable Hospital and medical staff requirements;
>
> (c)  Maintain current and show evidence of current DEA registration;
>
> (d)  Be qualified as a Medicare/Medicaid provider;

Corporation shall, as soon as it has knowledge, inform the affected Hospital if any of the foregoing standards are not met by Physician providing Physician Services hereunder.

2.2.4  Cooperation. Each Physician shall reasonably cooperate with Hospital in the investigation of any claim or lawsuit against Physician, Corporation, or Hospital arising out of care rendered pursuant to this Agreement, and shall further reasonably cooperate in the defense of any lawsuit against any of them arising therefrom.

2.3  Programs. Corporation shall routinely query the Office of Inspector General's listing of individuals excluded from Federal healthcare programs as to all Physicians providing Physician Services to Hospital pursuant to the Agreement. Corporation shall exclude from participation in the Physician Services any Physician who is excluded from Federal healthcare programs.

2.4  Staffing. Corporation shall staff in sufficient and reasonable numbers and at appropriate and legal ratios in order to provide physician and APP services for ED patients of Hospital on a continuous, 24 hour per day, 7 day per week, 365 days per year basis, and to comply with legal standards of medical care in Hospital's community and the standards for participation in Medicare and Medicaid. Corporation shall supply to Hospital all true and correct documents to aid Hospital in its credentialing of each Provider for medical staff privileges. The emergency

2

department will be staffed 24 hours per day by an EM boarded emergency department physician showing evidence every two (2) years of ATLS certification, and 2920 hours annually'

by a Nurse Pratitioner or Physcian Assistant unless otherwise mutually agreed on by the hospital and corperation

Corporation will have a full-time Medical Director who's duties are outlined in Exhibit A. Hospital to pay the Medical Director Stipend Fee to be capped at $75,000 or at a mutually agreed upon fee.

The Medical Director will support Hospital initiatives in the community.

To properly evaluate the patient experience, NES Health will implement **Client IQ** satisfaction surveying tool in the emergency department. Client IQ surveys ED patients in real-time using touch screens and reports performance back to Site Medical Director immediately for real-time service recovery.

It is expressly agreed between Hospital and NES that due to the nature of the business of NES, the expertise exercised by NES in securing services of physicians, and the irreparable harm to NES resulting from loss of said physicians due to the limited number of physicians that provide said services and due to the cost and expense incurred by NES in obtaining said services of physicians, that during the term of this contract and for a period of one year thereafter, Hospital or any organization or facility directly or indirectly affiliated with Hospital will not directly or indirectly enter into any agreement covering the same or similar services as are provided herein with any physician introduced to it by NES or with whom it came into a business or professional relationship as a result of this contract except that NES shall not prevent any physician who holds active staff membership from treating his patients in the hospital emergency room department. Hospital acknowledges that NES, upon termination of this contract, could place physicians who provided services under this contract at other hospitals and thus continue to benefit from the investment NES has made in securing the services of said physicians. Therefore, in addition to any and all remedies available to NES under this and any other Agreements, Hospital agrees that if it, or any hospital or parent or subsidiary corporation of the Hospital, employs, schedules, or permits the scheduling of any physician in violation of the terms of its agreements herein, Hospital will pay NES Twenty-fivethousand Dollars ($25,000) per physician and Ten Thousand ($10,000) per APP.

## Article 3.
## DUTIES OF HOSPITAL

In addition to other duties imposed upon Hospital under this Agreement or by applicable law, Hospital shall have the following duties:

3.1    Equipment. Hospital shall provide at its expense all equipment, expendable supplies

3

and customary supportive services necessary for the performance of Corporation's and Physician's responsibilities hereunder. Hospital shall maintain and repair all equipment.

3.2    Utilities. Hospital shall provide utilities for the usual maintenance of services in the Department.

3.3    Staffing. Other than the Physicians and APP's, Hospital shall provide such staffing as required for the efficient operation of the Department and be solely responsible for the payment of their compensation.

3.4    Medical Records. Hospital shall allow NES and its agents, at any time, and from time to time, both during and after the term of this Agreement, to inspect and/or duplicate, at its expense, any individual chart or record to the extent necessary to meet the responsibilities to such patients and/or to assist in the defense of any malpractice or other claim to which such chart or record may be pertinent. NES and its agents shall maintain patient confidentiality with respect to any information it or its agents shall obtain hereunder, subject to the applicable laws.

## Article 4.
## INSURANCE AND INDEMNIFICATION

4.1    Insurance.    For the purpose of securing the risk of liability for rendering or failing to render the Physician Services herein, Corporation shall cause each Physician to maintain professional medical malpractice liability in the amounts of $1 million /$3 million. Corporation shall purchase, or arrange for the purchase of, either (i) an extended reporting endorsement ("Tail Coverage") for the maximum period that may be purchased from its insurer (ii) "Prior Acts" coverage from the new insurer with a retroactive date on or prior to the date Corporation (or Corporation's Representative, as the case may be) began performing Services at Hospital, or (iii) maintain continuous coverage with the same carrier for the period of the statute of limitations not to exceed three years(3) for personal injury. All such insurance shall be kept and maintained without cost or expense to Hospital. In the event Corporation does not purchase the required coverage, Hospital, in addition to any other rights it may have under the terms of the Agreement or under law, shall be entitled, but not obligated, to purchase such coverage. Hospital shall be entitled to immediate reimbursement from Corporation for the cost thereof. Hospital may enforce its right of reimbursement through set-off against any sums otherwise payable to Corporation or any Corporation's Representative who failed to maintain the required coverage. Corporation shall provide Hospital with a certificate or certificates of insurance certifying the existence of all coverage required hereunder. Corporation shall request its or their insurance carriers to provide Hospital with not less than thirty (30) days prior written notice in the event of a change in the liability policies of Corporation. **4.2 Indemnification.** Each party shall protect, indemnify, and hold harmless the other party and its officers, directors, employees, affiliates, agents, parent, subsidiaries and affiliates, from and defend against any and all claims, demands, actions, settlements, costs, damages, judgments, liability, and expense of any kind (including settlements, judgments, court costs, and attorneys' fees and expenses actually and reasonably incurred, regardless of the outcome of such claim or action) arising out of, based on, resulting from, or in any way related to injuries or damages to persons or property in connection with the provision of Services by the ~~indemnifying~~ indemnified party hereunder, and including but not limited to, any loss, injury, or damage incurred by the indemnifying party as a result of any lapse, suspension, or revocation of the license(s) or

4

certification of the indemnifying party or any of Corporation's Representatives during the performance of Services pursuant to the Agreement. Each party specifically reserves any common law right of indemnity and/or contribution which it may have against the other party in connection with and caused exclusively by provision of services.

1)

## Article 5.
## MEDICAL JUDGMENT OF CORPORATION'S PHYSICIANS

Notwithstanding any other provision of this Agreement, Corporation shall not be required to perform any duties which, alone or in the aggregate, would tend to interfere with or impair the free and complete exercise of Physician's good and competent medical judgment and skill, or cause a deterioration in the quality of medical care rendered by such Physician. This Agreement shall not be construed to alter the Physician's relationship with Physician's patients or to interfere with the Physician's ability to provide appropriate medical services, or make referrals to other physicians, or admission to hospitals, or to interfere with medical decisions made by the patient and the Physician, regardless of any terms of this Agreement.

## Article 6.
## INDEPENDENT CONTRACTOR

In the performance of the duties and obligations of Corporation under this Agreement, it is mutually understood and agreed that Corporation and the Physicians are at all times acting and performing as independent contractors. The Hospital recognizes that Corporation is not engaged in the practice of medicine and does not and will not exercise control of any nature, kind, or description relating to the mode, manner, or means by which the Physicians shall perform their duties herein.

Corporation will ensure Physicians go through a HIPAA compliance program either provided by the Corporation or the program provided by the Hospital.

Physicians will sign the Hospital's Business Associate Agreement

Article 7.

## EFFECT OF NEW AND EXISTING
## LAWS AND CHANGE OF CONDITIONS

The parties agree to attempt to renegotiate this Agreement upon the occurrence of one of the following events:

7.1    If either party would be materially adversely affected by continued performance as a result of change in laws or regulations, which require that one party complies with a law or regulation contrary to the party's prior reasonable understanding;

7.2    Should any material portion or provision of this Agreement be declared illegal or in violation of any state or federal statute, law, rule or regulation, by any court or state or federal agency;

7.3    Should any material portion or provision of this Agreement be in violation of the Medicare laws, rules or regulations, as reasonably interpreted pursuant to any official interpretation, ruling, order, or advisory report of the U.S. Justice Department, Department of Health and Human Services, Centers for Medicare and Medicaid Services, or Hospital's legal counsel; or

7.4    Should Corporation or Hospital receives notice from any federal or state agency that, in that agency's opinion, any material provision or provision of this Agreement is in violation of any federal or Illinois statute, law, or rule or regulation, or official opinion.

The party affected must promptly notify the other party of the change, required compliance, official notice, or evidence of a violation, and its desire to renegotiate this Agreement. If the parties hereto are unable to agree in good faith on a modification to such portion or provision of this Agreement, which modification does not materially alter a material benefit of the original Agreement enjoyed by either party, and if a new agreement is not executed within thirty (30) days of receipt of the renegotiation notice, the party adversely affected shall have the right to immediately terminate this Agreement upon written notice to the other party.

## Article 8.
## MEDICAL AND RELATED RECORDS

Medical Records. All medical records, claims, and correspondence generated by, or on behalf of, Corporation or any Physician during this Agreement shall belong to the Hospital in whose Department the Physician provided Physician Services. Physicians will be required to use the Hospital's electronic health record system. Hospital shall also provide Corporation a minimum of ninety (90) days notice in advance of any future eMR implementations. Hospital will work collaboratively with Corporation to ensure the site medical director, or designee, is involved in the design and development of clinical charting documentation protocols and conduct all necessary testing, as appropriate. Prior to the complete implementation of a new EMR, Hospital will grant Corporation the opportunity to conduct an electronic charting audit to ensure all elements required for billing the physician services are adequately and accurately obtained to the satisfaction of Corporation.

## Article 9.
## FINANCIAL MATTERS

9.1     Fee Schedule. Corporation will establish a schedule of Physician fees to be charged to all patients in the Hospital's emergency department. Corporation shall provide a schedule to the Hospital for review and notify the Hospital of any changes to the Fee Schedule.

9.2 Bill and Collect. Corporation shall be entitled to bill and collect from patients and payors the professional component charge for the Physician Services provided by the Physicians hereunder. Consistent with Medicare and Medicaid requirements, Corporation shall not render a professional component bill except where permitted by applicable Medicare and Medicaid statutes and regulations. Charges shall also be consistent with applicable contracts with third-party payors. The Hospital acknowledges and agrees that it will not bill and/or collect Physician Services rendered in the emergency department of the Hospital and that the Corporation shall be entitled to retain the Physician charges.

9.3     Electronic Assistance. Hospital shall provide by electronic means that information required to assist Corporation in billing for Physician Services.

Electronic Document Transfer Support. Hospital shall generate electronically all information required to assist corporation in billing for Physician Services, including but limited to the following, in one complete record per patient:

   a. Emergency Department Census Log

   b. Complete Chart Document Requirements – One format (PDF, TIFF, JPEG) per encounter, electronically transferred to include but not limited to:
      i. Demographics/Face Sheet
      ii. Physician, Mid-Level, , and Nursing Documentation
      iii. Physician Orders & Results
      iv. Procedure Note (to include services performed on the floor, if applicable)
      v. Physician Addendums
      vi. Signature pages (Co-signature)
      vii. Discharge Summary
      viii. & Consent Forms

   c. **Complete Demographic Requirements –**
      i. Patient Name, address, and phone number
      ii. Patient DOB / Gender;
      iii. Patient marital status;
      iv. Guarantor/Responsible party name, address, phone number and relationship to patient;
      v. Patient and Responsible party Social Security Number;
      vi. Responsible party employer name and address;
      vii. Insurance carrier information;

7

           1. Insurance name, address, policy, and group number;
           **2.** Subscriber Name, Address, DOB, and relationship to patient;
           **3.** page;
           **4.** (front/back);

    **viii.** ;
     **ix.** Any other information reasonably requested by Corporation and agreed to by Hospital.

  **d. Electronic File Transfer**
     **i.** SFTP
     **ii.** VPN Tunnel

    9.4    <u>Services Rendered</u>. Each Physician shall describe, for coding and billing purposes, the services rendered by him/her with sufficient particularity to enable a payor to reasonably determine the services rendered and shall include complete patient identification, diagnosis, and itemization of services provided.

    9.5    <u>Information Requested</u>. Hospital shall furnish, on request, all information reasonably required by third-party payors to verify and substantiate the provision of covered services and charges for such covered services including, but not limited to:

    a. Patient name;
    b. Patient gender;
    c. Patient date of birth;
    d. Patient marital status;
    e. Responsible party name;
    f. Responsible party address;
    g. Responsible party telephone number;
    h. Responsible party employer;
    i. Insured's name (if different from patient);
    j. Insured's sex;
    k. Insured's date of birth;
    l. Insured's address;
    m. Relationship of patient to insured;
    n. Insured's employer (if group policy);
    o. Insured's employer's address;
    p. Name of insurance company;
    q. Address of insurance company;
    r. Policy certificate number;
    s. Group policy number;
    t. Copies of insurance card or cards (front and back);
    u. Copy of emergency registration log;
    v. Date of service;
    w. Copy of clinical documentation prepared by the Physician;
    x. Copy of patient registration documents;

       y.  HMO/PPO authorization numbers approvals (if applicable);

       z.  Copy of paid at time of service receipt (if applicable); and

      aa. Any other information reasonably requested by Corporation and agreed to by Hospital.

9.6    Cooperation. Each party will cooperate with the other party in the billing and collecting of fees for the Physician Services and will execute those documents helpful or necessary to implement this Agreement. Further, each party shall furnish upon request all information reasonably required by third-party payors to verify and substantiate the provision of covered services and charges for such services. Corporation will work diligently to be in network with all payers, should negotiations be unsuccessful coorporation will write off balance after insurnace, assuming rates are fair market value.

9.7    Insurance Plans. The Physicians agree to participate in governmental programs, including Medicare and Medicaid and their respective HMO/PHOs. The Corporation retains the right to be nonparticipating with all other managed care providers unless reasonable market rates can be negotiated. Corporation shall communicate with Hospital the status of all managed care contracts including in-network and out of network plans.

In the event the Hospital receives payment for services rendered by the Physicians, the Hospital will immediately deliver over all such payments to Corporation.

9.8    Subsidy and Adjustments.  In order to ensure the increased and continual availability of Emergency Medical Services in the community, which are essential to the delivery of many other medical services in the community, the Hospital is committed to providing a Subsidy to the Corporation.

1.  In year one, The Hospital agrees to pay Corporation a Subsidy of $1,622,835. Such payment shall be made in consecutive and equal monthly installments on the first day of each month during the term of this Agreement. In the event any payment or fee due hereunder is paid later than the thirtieth (30th) day following the due date of said payment, interest shall be chargeable on said sum due at an interest rate of one and one-half percent (1 1/2%) per month. Hospital agrees that the subsidy is predicated on ED billable visits of 13,916. If volume decreases 7.5% or more below 13,916 per year, Corporation will require a payment from the Hospital equal to the "CPV" for every visit below that threshold. If volume is 7.5% or more above 13,916 per year, Hospital will require a payment from the Corporation equal to the "CPV" for every visit above that threshold to the hospital. The estimated CPV is $125.

2.  If total cash collections in any given year exceed the targeted patient collections, Corporation will reduce the next year's subsidy payment by 60% of cash collected in excess of targeted patient collections The annual targeted patient collections are $1,739,500 .

3.  Hospital agrees to cover 100% of any excess staffing costs over hourly base rate for the first 30 days of the contract. This includes payments to locums and shift bonuses for

9

existing providers. Hospital and Corporation agree to share 50/50 excess staffing costs over hourly base rate including costs of any locum's providers or shift bonuses for the next 90 days. This rate is to be capped at 30% above the base rate ($350) except for holiday hours. Hospital will be responsible for any buy-out provisions should Corporation retain doctors from the current group. Hospital and Corporation will mutually agree on this buy-out provision.

4. Future sign-on bonuses and/or relocation incentives will be agreed upon by both parties in writing before an offer is made. Hospital agrees to fund those costs for the entirety of the contract or pay for buyout for any Provider recruited by coorperation upon termination of contract for any reason. Buyouts at time of termination are $25,000 for doctors and $10,000 for APP's. Any doctors/APPs that hospital pays for sign-on bonuses, relocation costs or buyouts from company other than corporation shall be excluded from buyout with corporation.

## Article 10.
## TERM

10.1    The term of this Agreement shall begin at 12:01 a.m. on 12/1/17 (the "Commencement Date"), and shall end on 12/1/20.

10.2    This Agreement may be terminated in accordance with the following:

10.2.1   Termination for Cause. In the event of a material breach by one party, the non-breaching party may terminate the contract for cause, at any time after forty-five ( 45) days written notice to the defaulting party specifying the event or details of the breach to the defaulting party and where the defaulting party has failed to cure the breach within the forty-five (45) day period.   Corporation may terminate immediately if Hospital fails to make payments as required in 9.8 herein.

10.2.2   Termination Without Cause. Either party may terminate this Agreement without cause, upon giving the non-terminating party 90 days prior written notice of the terminating party's intent to terminate. The notice shall state the date of termination of the Agreement. All notices shall be given pursuant to the notice provisions of this Agreement.

10.2.3   Renewal. The parties agree that one hundred twenty (120) days prior to the end of this Agreement, the parties will begin negotiations to extend the services for an additional twelve- (12) month term. In the absence of a new agreement, the terms of this agreement will automatically renew for the next 12 months.

10

**Article 11.**

## CONFIDENTIALITY

The parties consider the terms of this Agreement to be confidential. Neither Corporation nor Hospital shall disclose the terms and provisions of this Agreement, except:

11.1    with the prior written consent of the other party;

11.2    as required by a State licensure board, the Joint Commission, third-party reimbursement agencies, or professional review organizations;

11.3    pursuant to subpoena, court order, or affirmative legal obligation; or

11.4    to a party's attorney, accountant, and financial advisor, or for any other valid business purpose, upon receiving from them commitments to maintain such terms in confidence.

## Article 12.
## MISCELLANEOUS

12.1    Headings. The headings to the various sections of this Agreement have been inserted for convenience of reference only and shall not modify, define, limit or expand the express provisions of this Agreement.

12.2    Notices. All notices, requests, demands, or other communications provided for in this Agreement shall be in writing and shall be deemed to have been given at the time when personally delivered, or mailed in a registered or certified prepaid envelope, return receipt requested, to the address below:

| | |
|---|---|
| **If to Corporation:** | Jennifer Moore , CPA, MHA, MBA |
| | CEO |
| | NES Health |
| | 39 Main Street |
| | Tiburon, CA  94920 |
| | |
| **If to Hospital:** | CEO |
| | Galesburg Cottage Hospital |
| | 695 N. Kellogg St. |
| | Galesburg, IL  61401 |
| | |
| With Copy to: | 1573 Mallory Lane, Suite 100 |
| | Brentwood, TN  37027 |
| | Attn: General Counsel |

11

or to such other address as hereinafter may be notified in writing by one party to the other.

12.3    Amendment; Waiver. This Agreement shall not be modified or amended except by a writing signed by the parties hereto. Furthermore, any failure of a party to enforce its rights under any provision of this Agreement shall not be construed, or act as a waiver of, said party's right to enforce any of the provisions contained herein.

12.4    Entire Agreement. This Agreement, including any documents or items referred to herein, sets forth the entire Agreement and understanding between the parties hereto as to the matters contained herein, and no party shall be bound by any condition, definition, warranty, or representation other than as expressly provided for in this Agreement.

12.5    Severability. If any provision of this Agreement, or the application of any provision hereof, to any person, entity or circumstance is held invalid, the remainder of this Agreement and the application of such provision to other persons, entities or circumstances shall not be affected, unless the invalid provision substantially impairs the benefits of the remaining provisions of this Agreement.

12.6    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Illinois.

12.7    Further Assurance. The parties agree to execute such other documents as may be required to implement the terms and provisions and fulfill the intent of this Agreement.

12.8    Assignment. This Agreement shall be binding on and inure to the benefit of the parties and their successors and permitted assigns. Neither party may assign this Agreement, without the prior written consent of the other party, which consent may not be unreasonably withheld. However, any assignment of Corporation's responsibilities hereunder shall not operate to relieve Corporation from liability hereunder.

12.9    Government Disclosures. Until the expiration of four (4) years of the furnishing of services pursuant to this Agreement, the parties shall, as provided in Section 952 of the Omnibus Reconciliation Act of 1980, make available upon written request from the Secretary of Health and Human Services, or upon request from the Controller General of the United States, or any of their duly authorized representatives, this Agreement, and all books, documents, and records of the party that are necessary to verify the nature and extent of the cost of any services furnished pursuant to this Agreement for which payment may be made under the Medicare program.

12.10   Time of Essence. Time is of the essence in this Agreement.

12.11   Survival. Upon expiration or termination of this Agreement, for any reason, any obligations that by their terms or nature extend beyond the date of expiration or termination to be effective shall survive expiration or termination.

12.12   Dispute Resolution. Other than relief seeking remedies of an equitable nature, for

12

which resort to any court of competent jurisdiction may be had by either party, any controversy arising under, out of, in connection with, or relating to this Agreement, any amendment thereto, or the breach thereof, shall be determined and settled by arbitration in New Iberia, LA in accordance with the rules and regulations of the American Arbitration Association. Any award rendered therein shall be final and binding on each and all of the parties and their personal representatives and assigns. Any judgment may be entered thereon in any court of competent jurisdiction.

**[Signatures appear on the following page]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

GALESBURG COTTAGE HOSPITAL

By:     James Flynn,
        CEO

Date:   11/30/17

NES _____, INC.

By:     Jennifer Moore, CEO

Date:   11/30/17

14

Exhibit A

**Position: SITE MEDICAL DIRECTOR**

**Position Summary:**

The Medical Director will provide on-site management of the clinical and administrative aspects of the emergency department for the client hospital, at which NES Healthcare Group (NES) is contracted to provide medical services.

The position shall report to the Regional Medical Director on administrative and clinical matters related to the fulfillment of NES' (or a company contractually associated with NES) contract with the Hospital. The Director shall report to the administrator of the Hospital or his/her designee in accordance with the reporting mechanisms developed by the hospital. The Director shall serve as a member of committees as requested by the client hospital or NES leadership. S/he will also encourage participation of staff Emergency Physicians in hospital committee and leadership roles.

**Duties and Responsibilities:**

**Emergency Department Quality Improvement/Risk Management Leadership.**

As the role model for other physicians, the Director should promote an atmosphere of care and understanding for the patient and their family members as well as the highest quality of care, thorough assessment, diagnosis, treatment, and disposition of patients.

A.      **Quality Improvement.**

The Director will:
- Assist in the maintenance of the QI system developed by the Hospital and hold monthly ED staff meetings to promote quality goals and communication.

- Review ED charts and clinical care generated by departmental personnel, and participate in peer review process developed by the hospital.

- Implement and document remedial action plan (s) for problems identified through QI process.

15

- Prepare and present monthly QI reports to Regional Medical Director, the medical staff committee, and/or such other committee of the hospital as requested.

- Lead and participate fully in the Quality and Process Improvement program developed by NES.

- The medical director will actively participate in the performance improvement program and other patient care evaluation and monitoring activities of the Emergency Department.

- As required by IDPH, a resource hospital for EMS, is required to name a designated EMS director. Therefore, the Corporation shall provide an EMS Medical Director, mutually agreed upon between the Corporation and Hospital, who will possess the requisite skill and training for the oversight of care, treatment and services of the EMS system required for an EMS resource facility. There shall be no additional compensation paid by the hospital for the duties required as EMS Medical Director.

B.    The Medical Director will prepare the ED for site visits and surveys by regulatory, licensing and accrediting agencies.

C.    The Medical Director will enforce rules governing the ED by regulatory agencies including but not limited to JC, the state department of health regulations, medical staff bylaws, COBRA and EMTALA, Emergency Department policies and procedures, fire-codes, pharmacy board regulations, and insurance company rules.

D.    The Medical Director will develop, implement and comply with policies and procedures suggested and required by both the client hospital and NES.

F.    The medical director will participate in the hospital Disaster Plan and Emergency Preparedness programs.

## Management.

The medical director will motivate and direct the ED staff to achieve or exceed the Emergency Department goals and objectives formulated by the client hospital administration, NES, and outside regulating bodies.

A.    **Physician Management.**

    The Medical Director will:
- Promote an atmosphere conducive to physician staff collegiality.

16

- Aid in recruiting qualified physicians for NES.

- Prepare and submit physician's monthly schedules, not less than 30 days prior to the first scheduled shift to ensure optimal coverage at the client hospital.

- Assist the NES operations staff with locating and providing backup coverage for ED in extreme situations where a replacement cannot be found.

- Conduct an orientation for new physicians to familiarize them with medical record documentation, EMR education, the client hospital, the community and department as well as hospital policies and procedures.

- Review and monitor the credentials, training, and education of NES physicians recommended for assignment to the client hospital.

- Monitor and evaluate physician performance and provide both formal and informal feedback on findings regarding documentation, clinical care, collegiality, behavioral and professional conduct.

- Maintain documentation on physician evaluation and recommend remedial action, discipline and/or discharge as needed.

- Provide notification to the Regional Medical Director and the hospital of any incidents involving ED physicians or Advance Practice Professionals and any events that could be considered high risk.

- Mediate policy and procedure dispute between physicians and the client hospital.

- Monitor appropriate standards of dress, hygiene, and behavior of ED physicians.

- Actively manage and monitor NES educational programs and corporate image at the hospital.

B.    **Emergency Department Management.**

The Medical Director will:
- Strive to achieve an efficiently run operation at the ED.

- Facilitate the departmental performance to meet or exceed standards described in the hospital bylaws, departmental policies, the JCAHO Manual of Accreditation (if applicable), and in other appropriate local and national standards.

17

- Cooperate with clinical and nursing supervisors to ensure that physician performance adheres to hospital standards, objectives and policies.

- Work cooperatively with the heads of diagnostic and therapeutic departments to assure availability, quality, and effective use of services.

- Provide input into formulating a departmental budget for adequate equipment and medications supplies.

- Serve on the client hospital medical staff executive committee, and the ED committee and/or committee designated by the hospital designated to administer the Emergency Department.

**Public Relations.**

The medical director represents the client hospital's ED and NES both within the facility and externally.  The Medical Director will:

A.    Promote ED marketing and public relations programs for the client hospital within the content of the hospital's master plan for public relations and marketing.
B.    Be a positive representative of the ED, the hospital, and NES to the community.
C.    Ensure effective communication with patient and families, nursing staff and administration.
D.    Coordinate with paramedics and the local EMS system to provide pre-hospital care to patients.
E.    Coordinate CME with EMS and hospital auxiliary staff.

**Qualifications.**

The Emergency Medical Director will maintain at a minimum the following credentials and qualifications:

- Licensed physician (licensed in state where intending to practice).

- Board certification in Emergency Medicine.

- DEA (with all schedules).

- State Controlled Substance (if applicable).

- ACLS certification, ATLS certification and board certified in Emergency Medicine.

- Appropriate emergency medical experience.

# EXHIBIT B

## Galesburg Cottage Hospital

695 North Kellogg Street    •    Galesburg, Illinois  61401    •    Telephone: 309-343-8131

January 24, 2020

Ms. Jennifer Moore, CPA, MHA, MBA
Chief Executive Officer
NES Health
29 Main Street
Tiburon, CA 94920

Sent Via Certified Mail, Return Receipt Requested

Dear Ms. Moore:

I am writing today regarding an agreement between Galesburg Cottage Hospital, Galesburg, Illinois and NES Michigan, Inc. related to Emergency Department Staffing Services effective December 1, 2017.

Pursuant to Article 10.2.2. Termination Without Cause, we are hereby giving a 90-day notice of contract termination effective May 1, 2020. During the next 90 days we ask that you work with the new company that we have engaged to ensure a smooth transition.

Any questions regarding this can be directed to me at Robert_moore@quorumhealth.com or 309/345-4567. In advance, thank you for your past service to Galesburg Cottage Hospital.

Sincerely,

Bob Moore, FACHE
Chief Executive Officer

CC: 1573 Mallory Lane, Suite 100
    Brentwood, TN 37027
    Attn: General Counsel